482 So.2d 706 (1985)
LOUISIANA POWER & LIGHT COMPANY
v.
Lorraine Zeringue, wife of/and Roger L. MOBLEY.
LOUISIANA POWER & LIGHT COMPANY
v.
Thomas William SMITH.
LOUISIANA POWER & LIGHT COMPANY
v.
Eloise Spears, wife of/and Elbert W. THOMAS.
LOUISIANA POWER & LIGHT COMPANY
v.
Alva Otto SMITH, et al.
LOUISIANA POWER & LIGHT COMPANY
v.
Dewey B. SMITH.
LOUISIANA POWER & LIGHT COMPANY
v.
Marie Badeaux, wife of/and Terry PATKE.
LOUISIANA POWER & LIGHT COMPANY
v.
Terrance Kenneth SMITH.
LOUISIANA POWER & LIGHT COMPANY
v.
Karen Naples, wife of/and George C. KOCKE, Jr.
Nos. 84 CA 1083 to 84 CA 1089.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
Rehearing Denied February 7, 1986.
Writs Denied March 31, 1986.
*707 Jim W. Richardson, Bogalusa, Eugene G. Taggart and John Turner, New Orleans, for plaintiff and appellant La. Power and Light Co.
John Gallaspy, Bogalusa, for Lorraine Zeringue, wife of and Roger L. Mobley, Karen Naples, wife of and George C. Kocke, Jr. and Eloise Spears, wife of and Elbert W. Thomas.
Richard Brown, Bogalusa, for Alva Otto Smith, Dewey B. Smith, Marie Badeaux, wife of and Terry Patke and Terrance Kenneth Smith.
Jack Rogers, Baton Rouge, for Dewey B. Smith.
Jack Dunn, Metairie, for Karen Naples, wife of and George C. Kocke, Jr.
Before GROVER S. COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
Eight expropriation suits were filed by Louisiana Power & Light Company (LP & L/plaintiff) in Washington Parish, where they were consolidated and tried. Pursuant to the authority of LSA-R.S. 19:1, et seq., LP & L sought to acquire from the respective landowners (defendants) a 200-foot wide right-of-way running generally north and south in Washington Parish for the construction, operation and maintenance of a 500,000-volt electric transmission *708 line. This line will be overhead and consist of three phases supported by large steel H-frames every 1,000 feet.
There are two groups of landowners involved. One group of three own adjoining tracts in the north-central portion of the Parish. These defendants will be referred to individually as Kocke, Thomas and Mobley. The second group is located in the central part of the Parish closer to Bogalusa and will be individually referred to as Terrance Smith, Alva Smith, Dewey Smith, Thomas Smith[1] and Terry Patke.
The trial court found that the plaintiff proved its case by a preponderance of the evidence as to the public purpose and need. It awarded just compensation and damages to each of the defendants in varying amounts. It also granted plaintiff reasonable rights of ingress and egress for the purpose of going to and from the servitude over the remaining properties of the defendants. LP & L has appealed the various awards of compensation and damages. Defendants have answered the appeal, seeking additional awards and reversal of that part of the trial court judgment which granted ingress and egress over the remainder of their land.
PUBLIC PURPOSE
LP & L produced several witnesses who testified that this line was necessary to tie into its Mississippi line and to take said line to its Bogalusa switching station; that said line will provide electricity to the general southeastern Louisiana area and in particular the fast-growing area north of Lake Pontchartrain; that without this line LP & L would be unable to provide the additional capacity needed to serve this growing population; that its present sources are inadequate even when considering interconnection with other systems; that southeastern Louisiana needs a north-south transmission line to bring cheaper Mississippi power into the area; that without this transmission line LP & L would be unable to import cheap electricity from the north and would be forced to generate power from its oil- and gas-fired capacity which would be more costly to the users; that this line will effect an economic savings to its customers of billions of dollars through 1990; that the route selected was chosen because it avoided residential areas, stuck to property lines, took into consideration the owners' convenience and was most economical.
The defendants produced no evidence to rebut this prima facie showing of public purpose, need and location on the part of LP & L. We cannot say that the trial court was clearly wrong in finding that:
LP & L presented ample evidence supporting the proposition that the line is needed in order to fulfill the current and future electrical needs of the area. The landowners did not rebut any of the evidence. There was no showing that LP & L acted in bad faith, arbitrarily or unreasonably. Therefore, neither the decision by LP & L to construct the line nor LP & L's decision as to the location of the line will be disturbed.
PART TAKEN
Thomas Dowell and James Stevenson were plaintiff's real estate appraisers and testified as to real estate values and damages. Both used the market value approach and found comparable sales within the general proximity of subject properties. Both found the highest and best use for these properties to be rural residential. The comparables found by these appraisers were generally the same. Based on said comparables and their independant analyses, Dowell found a unit value of $1,625.00 per acre for the Kocke property, $1,400.00 per acre for the Thomas property, and $1,400.00 for the Mobley property. Dowell estimated a residual use of 25% would remain after the takings and discounted accordingly. Stevenson estimated that the *709 Kocke property was worth $1,450.00 an acre; that the Thomas property was worth $1,395.00 an acre; and that the Mobley property was worth $1,450.00 an acre. He estimated a residual value after the taking of 10%.
Dowell and Stevenson were also plaintiff's appraisers for the Smiths and Patke properties located in the middle portion of the Parish. These tracts were much smaller in total area but both appraisers were able to find comparable sales to assist them in their analyses of value. Dowell's valuation for these tracts ranged from $2,250.00 to $2,750.00 per acre. He estimated a residual value after the taking of 25% and discounted accordingly. Stevenson's valuation for these properties ranged from $1,800.00 to $2,000.00, and he estimated a 10% residual value after the taking.
Defendants' appraisers were G. Wallace White, Don Spiers and Kermit Wayne Williams. White and Spiers did appraisals for all but the Dewey Smith tract, which was done by Williams. These appraisers also used the market value approach and found comparable sales to assist them in their valuations in the general vicinity to the subject properties. They were all of the opinion that the highest and best use for all these properties was rural residential. Defendants' appraisers found many of the same comparables used by LP & L's appraisers. White placed a unit value of $1,650.00 per acre on the Kocke property, $2,000.00 per acre on the Thomas property, and $1,550.00 per acre on the Mobley property. He assigned no residual value to the part taken after the taking. Spiers estimated the value of the Kocke property at $1,800.00 per acre, the Thomas property at $2,000.00 per acre, and the Mobley property at $1,850.00 per acre. He placed a residual value of 10% on each of these three properties after the taking.
The Alva Smith tract involves multiple ownership. Alva Smith and Dewey Smith are the only undivided owners before the court. White estimated this property at $3,200.00 per acre. Spiers estimated it at $3,000.00 per acre with a 10% residual value. Williams estimated it at $3,800.00 per acre and felt that it had a 20% residual value after the taking.
Dewey Smith also owned a tract individually. White estimated the part taken from this tract to be worth $3,200.00 per acre with no residual value after the taking. Williams estimated the front acreage at $4,000.00 per acre and the rear acreage at $2,900.00 per acre and felt that the part taken had a 20% residual value after the taking of the right-of-way.
Two tracts were involved in the Terrance Smith taking. The north tract was valued by White at $3,200.00 per acre before the taking, and he felt that there was no residual value after the taking. Spiers estimated both tracts at $3,000.00 per acre and felt that there was a residual value of 10% after the taking.
Terry Patke's tract was valued by White at $3,200.00 per acre before the taking, and he placed no residual value on the part taken after the taking. Spiers valued the part taken at $3,000.00 per acre and estimated a residual value of 10% after the taking.
The trial court adopted Spiers' appraisal for the properties of Kocke, Thomas, Mobley, Terrance Smith, and Terry Patke. It adopted the Williams' appraisal for the properties of Alva and Dewey Smith in indivision, and Dewey Smith individually.
Our review must determine whether the trial court committed manifest error in these findings. The law in this area is well settled and provides that in an expropriation case, a trial court's finding of value will not be overturned when the award is based upon a reasonable and sound analysis of expert testimony. The trier of fact is authorized and has the right to determine the weight to be given to the testimony of each expert witness, and his determination will not be disturbed in the absence of manifest error. Missouri Pacific Railroad Company v. Nicholson, 460 So.2d 615, 622 (La.App. 1st Cir.1984), writs denied, 462 So.2d 185, 186 (La.1985); State Department of Transportation and Development *710 v. Estate of Clark, 432 So.2d 405 (La.App. 1st Cir.1983); State Department of Highways v. Kornman, 336 So.2d 220 (La.App. 1st Cir.1976).
Our examination of this record convinces us that the trial court did not err in its award of just compensation for the respective parts taken. The reports from Spiers and Williams contained objective reasons for their value estimates. Additionally, we note that LP & L paid Crown-Zellerbach $1,900.00[2] per acre for a right-of-way near the Kocke, Thomas and Mobley properties. Sales to an expropriator may be considered in reaching an opinion as to the value of the property. Louisiana Gas Purchasing Corporation v. Sincox, 368 So.2d 816, 818 (La.App. 2nd Cir.1979). The trial court accepted the valuations of Spiers. His appraisals were: Kocke, $1,800.00; Thomas, $2,000.00; and Mobley, $1,850.00. He also found a residual value of 10% after the taking. The Spiers' valuations on the Kocke and Mobley properties was less than LP & L actually paid for comparable property and were within $100.00 of the Thomas valuation. Spiers also made a 10% allowance for residual value. Clearly, the trial court did not commit manifest error in its awards for these rights-of-way.
In connection with the properties of the Smiths and Patke, we note that both LP & L's and defendants' appraisers used as a comparable the sale from Simmons to Belcher on April 29, 1983, of nine acres just two miles north of these properties on La. Highway 10, which generated a unit price of $3,086.00 per acre. Plaintiff's appraisers felt that this land was superior to subjects but defendants' appraisers thought that subjects' property was superior. Earlier in our opinion, we recited the various valuations placed on these properties by the appraisers. We need not repeat those valuations but considering same along with the Simmons-Belcher comparable, which produced a unit price of $3,080.00, we cannot say that the trial court committed manifest error in accepting the valuations fixed by defendants' appraisers.
SEVERANCE DAMAGES
The major battle in these cases was waged over severance damages. Two of LP & L's appraisers, Stevenson and Max J. Derbes, found no severance damages at all. Dowell found minimal severance damages to the properties of some of the Smiths and Patke, which he felt were damaged because of the configuration of the taking. The path of the taking crossed some of these properties at such an angle as to leave triangular and odd-shaped remainders which adversely affected usage.
On the other hand, all of defendants' appraisers found substantial severance damages to the respective properties. As it did with compensation for the part taken, the trial court adopted Spiers' opinion as to severance damages on all the properties except that of Dewey Smith which Spiers did not appraise. It adopted the Williams valuations on severance damages for the Dewey Smith property. In treating this matter, the trial court found as follows:
The five appraisers who testified as experts varied in their estimation of the percentage of "taking" of the land within the servitude itself, from seventy-five percent to one hundred percent. Mr. Stevenson and Mr. Dowell, testifying for LP & L, indicated that there were no severance damages to the remainder of any of the properties. Both testified, however, that given a choice, neither would [choose] to live near a high voltage power line. The other three appraisers employed varying percentages and distancesunder a "rainbow" or "strip" theoryto indicate the degree and the extent of severance damages.
M.J. Derbes, Jr., an experienced realtor and appraiser, testified by deposition in the rebuttal portion of plaintiff's case that he had conducted studies of sales of property along other five hundred thousand volt lines, and found no evidence in the marketplace of diminution in value of *711 property adjoining the right of way within 400, 500, or 800 feet as a result of the proximity of the five hundred thousand volt line. The five hundred thousand volt transmission line is a new phenomenon as far as Washington Parish is concerned, and therefore, the study of Mr. Derbes did not extend to sales in the Washington Parish area. Article 1, Section 4 of the Louisiana Constitution of 1974, provides in part that where property is expropriated "the owner shall be compensated to the full extent of his loss." Case law makes it clear that the intent behind this constitutional provision was to permit the property owner to remain in equivalent financial circumstances after the taking. In the northern part of the parish the line will be constructed over scenic rolling hills, perfect for rural residential development. The serenity of this rural atmosphere will be disturbed by the high towers to which the transmission lines will be attached. This line will, of course, also be constructed across the lands of other defendants situated near the center of the parish. These properties abut a good blacktopped road, and can be described simply as beautiful. It seems clear to this Court that any person who believes that the existence of the high towers and the attendant transmission lines will not bring about a diminution in value of the adjoining properties commits serious error. The rainbow or strip theory has received judicial approval on prior occasions, and when this is considered in light of the constitutional provision relating to just compensation for expropriated property, and the type lands involved in these law suits, this Court is convinced beyond any doubt that the landowners will sustain severance damages to the extent of the strips herein designated.
In reviewing the findings of the trial court in this regard, we begin with the Louisiana Constitution which provides that private property shall not be "taken or damaged" without payment of "just compensation" to the owner. La. Const. art. I, § 4; La. Const. art. I, § 2 (1921). The Louisiana Supreme Court has interpreted this provision to mean that in expropriation cases compensable severance damages may include depreciation in market value for preferential best use of the expropriated servitude or right-of-way and to affected adjacent strips and remainders of property. Proof of severance damage loss is based on a preponderance of the evidence based on the informed and reasoned opinion of experts, where corroborated by the facts in the record, especially where accepted by the trier of fact. There is no artificial formula by which damages must be proved, such as only by comparable sales.
The Supreme Court considered factors which any willing buyer would take into account and deduct from the net purchase price, including costs for offsite improvements which would increase his own unit cost of any lots or tracts sold (for example, street, sewerage, water and drainage crossings of the servitude) and psychological damage, or deterrence of prospective buyers by the fear of danger, which "in some cases is as bad as the danger itself." Texas Pipe Line Co. v. National Gasoline Co. of Louisiana, 203 La. 787, 14 So.2d 636, 638 (1943); Louisiana Power & Light Company v. Churchill Farms, Inc., 292 So.2d 183, 184-186 (La.1974).
In Churchill Farms, the court awarded severance damages for a 10% loss to 150-foot strips on each side of the high voltage electric transmission line and 150-foot-wide servitude but none for loss to the remainder of the property because there was no proof in the record that consequential damages would necessarily occur. 292 So.2d at 185-186. In Texas Pipe Line Co., the court awarded damages for the 20-foot-wide gas pipeline servitude and for a loss of half of the value of the adjacent land within a distance of 50 feet from the pipeline. 14 So.2d at 639.
This court has upheld severance damages in cases involving various sizes of rights-of-way, adjacent strips, and percentages of losses of value, including the issue of whether psychological damage causes *712 diminution of property value. It is well settled in this circuit that where the highest and best use for the property is for rural residential purposes, the presence of electrical transmission lines does cause damage.
While no fear element was found in Dixie Electric Membership Corporation v. Westbrook, 271 So.2d 637, 639 (La.App. 1st Cir.1973), because another transmission line already traversed some of the property, two other cases dealing with high voltage power lines found varying severance damages according to the effect of the line on each individual piece of property and a definite psychological impact due to the close proximity of an extremely high voltage power line. In Louisiana Power & Light Company v. Ristroph, 200 So.2d 14 (La.App. 1st Cir.1967), writs refused, 251 La. 39, 202 So.2d 654 (1967), this court upheld the trial judge's gradation of his percentage valuation of damages according to the distance to the transmission line or right-of-way, with the strip furthest from it having the smallest percentage of severance damages. Ristroph, 200 So.2d at 24. In Gulf States Utilities v. Moore, 197 So.2d 100 (La.App. 1st Cir.1967), writ refused, 250 La. 914, 199 So.2d 920 (1967), we held that an extremely high voltage power line with an unusually wide servitude can cause greater severance damage to the areas immediately adjacent to the right-of-way than to the remainder of the tract. Each expropriation case must be considered in the light of its own circumstances. Moore, 197 So.2d at 104.
Where there is wide divergence or difference of opinion between opposing witnesses as to the market value of property after the taking, with no reconciliation of that conflict, the court must look to the testimony of experts to determine which is well-grounded in good reasoning. The court is required to deal with the valuing of property by experts, especially those who deal in local transactions in the vicinity of the expropriated land, where there were no comparable sales which could be used as a rule of measure. Moore, 197 So.2d at 104, 105.
In an expropriation case the trial judge is granted much discretion in weighing the testimony of experts, and his factual findings as to severance damages and values will not be disturbed on review absent a finding of manifest error. In the realm of local property conditions, a trial judge's superior knowledge should and must be given great deference by an appellate court. Pointe Coupee Electric Membership Corporation v. Mounger, 447 So.2d 1104, 1110 (La.App. 1st Cir. 1984).
Derbes' deposition was taken by agreement after trial. He conducted market studies in East Baton Rouge, Ascension and Ouachita Parishes to determine whether market transactions reflected any diminution in value on property adjacent to overhead transmission lines. He felt that if people pay less for property adjacent to such lines or more for land further removed than 800 feet there is evidence of proximity damage. He admitted that he had never found such damages to any property anywhere at any time.
Derbes distinguished between proximity and orientation damages. Orientation damages result from the location of the right-of-way with the remainder, such as where a right-of-way crosses property and creates severe angles or remainders difficult to utilize because of size and shape. Proximity damage would result from loss of value to adjacent areas radiating out from the right-of-way to 800 feet based on public non-acceptance of high-voltage lines.
Derbes stressed that the market study he made showed no objective empirical evidence of diminution because of proximity damages and any personal prejudices, fears, etc., that the public may have against such lines did not adversely affect marketability. None of Derbes' studies, however, included any data as to whether the lines he studied were installed before or after the development of the surrounding property, or whether adjustments were made in size and price for land abutting electrical rights-of-way. He also admitted *713 that he did not interview any property owners while making his studies.
Spiers felt that only part of the remainders suffered damage, i.e., those parts proximate to the rights-of-way. He measured the affected portions in strips of 800 feet alongside the part taken. He estimated that the land within the strips was damaged 45% for the properties in the north group and 50% for the properties in the central group. He felt that the strips were a very specific way of measuring damages because you take the values of the area affected before the taking and subtract the values after the taking to obtain the amount of damages. Williams used the very same approach.
Among the factors that these appraisers used in determining that these properties suffered damage were:
A. The North Group
1. Subdivisions for residential development would have to be designed to allow for a high power electrical servitude.
2. The natural beauty of the land has been destroyed by the unsightly power lines.
3. The values of the remainders are reduced in marketability because of the inherent fear that people have of residing near high-voltage power lines.
B. The Central Group
1. The remainders are unconventional in size and shape, and some parcels are cut off and isolated from the whole.
2. Much of the natural beauty has been destroyed, and the properties suffer from the unsightliness of the power lines.
3. Inherent fear of residing near power lines adversely affects marketability.
LP & L counters with the argument that defendants' expert opinions as to site and fear damages were highly speculative and not supported by any evidence. We note, however, that Dowell and Stevenson testified that they would not buy near a high-voltage power line if given the choice between a property which was burdened with a power line and one which was not.
In addition to the real estate experts' opinions as to the damages, both sides produced scientific evidence as to the potential deleterious effects to animals' and humans' health because of the proximity of the lines and the charged electrical fields which emanate therefrom.
Dr. Charles H. Beck, a witness for the defendants, was qualified as an expert in electrical engineering and safety concerning the biological effects of high-voltage transmission lines. Beck testified that the actual operating voltage emanating from these lines would be on the order of 525,000 volts; that peak value would be some 41% greater; that as voltages are applied at the descending end of a transmission line, an electric field is developed which affects all physical matter in some proximity to the transmission line; that said electrical field or cloud spreads out a considerable distance from either side of the transmission line and affects the air molecules near the wire as well as all other physical matter in its zone; that the air molecules in the vicinity of the conductors are stripped of electrons and take the form of positive charged ions, resulting in a neutral particle becoming a charged particle; that density builds up to such an extent that an explosion takes place between the molecules and conductor which is known as a corona discharge; that these explosions manifest themselves in a wide area of phenomena such as television interference, AM radio range interference, static sounds, cracks, firecracker, all during foul weather; that during fair weather, just a buzz or a hum would be expected; that studies have been conducted which found that certain pacemakers malfunctioned because of electrical field intensity less than half of what the projected line would produce at 39 inches above the ground; that the field of intensity becomes greater as the distance between the ground and the wire gets shorter; that experiments have been made using laboratory *714 rats which indicate an increase in the white blood cell count among exposed animals.
Dr. John Newman, a medical doctor who has practiced family medicine in Washington Parish since 1967, became interested in this problem and did independent research into the problem. He testified that he would recommend that his patients stay away from this 500,000-volt line, especially people with pacemakers. He also testified about articles he read in learned medical treatises regarding human beings being subjected to electrical field stress which concluded that there was a much higher incidence of leukemia in persons who are exposed to electrical fields than persons who were not.
To rebut defendants' evidence regarding the deleterious effects presented by electrical transmission lines, LP & L produced Dr. H. Dwight Mercer, a veterinarian, Dr. Cedric F. Walker, a biomedical engineer from Tulane University, and Dr. Joseph B. Rusinko, a medical doctor.
Dr. Mercer is a professor of veterinary science at Mississippi State University. A 500-KV electrical line traverses his county, and he has watched it for many years. He testified that no health problems to animals have resulted from exposure to this line; that over a five-year period, cows exposed to the line were not affected and milk production actually increased from 9-10%; that while biological effects have been noted because of exposure to electrical fields there is a big difference between a biological effect and a biological hazard; that he referred to hazards and not effects when testifying that to his knowledge no health problems to animals were created by their exposure to the high-voltage line in his county.
Dr. Walker felt that Dr. Beck had inaccurate information relative to the rat studies and the white blood count report. He was of the opinion that no significant biological effects were noted after the rat study was completed. He did concede that there were slight differences after comparing overall growth, weight, etc. Walker also cited a study which found no relationship between leukemia and high-voltage power lines. Walker, however, on cross-examination, was forced to concede that a Tulane study in which he participated stated that "our findings cannot definitely prove that the... electric field acted as a stressor, our data is certainly consistent with the stress hypotheses when taken together with that available in the literature."
In discussing this evidence, the trial court said:
There was a great deal of evidence presented by both sides as to the possible health hazards that result from exposure to electrical fields such as those generated by high voltage transmission lines. Whether or not these alleged health hazards are ultimately proven to exist, the defendants' fear of this line is none the less real. This fear is not unreasonable, given the following facts(1) that there is evidencesome refuted, some notof adverse effects on animals and humans resulting from exposure to the electrical field of a high voltage transmission line, and (2) this problem has been debated, not only among physicians and engineers, but also in the news media, with no resolution in sight. In fact, defendant Kocke was advised by a family physician to move his young son, a child with a history of respiratory and immunological problems, completely out of the vicinity of the power line, on the grounds that exposure to the lines' electrical field might aggravate young Kocke's health problems.
While it is clear, then, that there is no conclusive proof that living close to a five hundred thousand volt power line is hazardous to your health, the Court notes the seriousand well-founded concern on the part of the landowners.
Our review of the record convinces us that the trial court was not manifestly in error when it accepted the opinion of Spiers and Williams regarding severance damages. As stated earlier herein, the findings of the trial court are entitled to great weight. Legitimate argument in the *715 scientific community has gone on for years and will continue regarding whether danger exists from electric fields under high-voltage power lines. While no deleterious effects have been conclusively proven, defendants have shown that honest minds differ in this area, and there is considerable support for their argument. This fear is certainly a factor which may be considered in fixing damages. The trial court did not err in considering it.
ACCESS TO THE RIGHT-OF-WAY
LP & L sought unrestricted ingress and egress to and from the rights-of-way granted. The trial court refused to grant unrestricted access but did grant reasonable rights of ingress and egress over the remaining properties for the purpose of going to and from the servitude. Defendants want this part of the trial court's judgment reversed. We find, however, that the judgment was correct. This identical issue was considered in Ristroph, 200 So.2d at 25, where we held:
it is inherent in servitudes of this type that the party obtaining the servitude should have the right of ingress and egress in order to protect, repair, upkeep and maintain the right of way for the purposes for which the servitude is granted. Without such a right he will be seriously hampered and in fact crippled in maintaining its service. We believe that it is axiomatic that in the event he caused damages to the property by exercising this right of ingress and egress that he would be held responsible for such damage.
ATTORNEY FEES
LP & L argues that the attorney fees given at the trial level were excessive. Our examination of the record indicates that they were reasonable and within the very great discretion accorded to the trial court. We also note that all of the defendants except Dewey Smith[3] have answered the appeal seeking more attorney fees, and in particular, additional attorney fees for services rendered in connection with this appeal. We agree that additional fees should be awarded in connection with the appeal, and same are granted as follows: Kocke, $3,000.00; Thomas, $4,000.00; Mobley, $3,000.00; Alva Smith, $2,500.00; Terrance Smith, $3,000.00; and Terry Patke, $2,500.00.
CONCLUSION
For the reasons hereinabove set forth, the decision of the trial court fixing just compensation for the parts taken, for damages, for reasonable access and for expert witness fees are affirmed; the decision of the trial court regarding attorney fees is amended to award additional fees for appellate representation. All costs are taxed to LP & L.
AFFIRMED IN PART, AMENDED IN PART AND RENDERED.
NOTES
[1] Thomas Smith did not appear or answer this lawsuit, and plaintiff proceeded against him by default. The trial judge rendered judgment, after confirmation of default, for $31.00 for a small parcel amounting to .015 acres. No appeal was taken, and this judgment is final. Seven landowners are, therefore, before this court.
[2] This price included any timber damages.
[3] See Bourne v. Rein Chrysler-Plymouth, Inc., 463 So.2d 1356, 1360-1 (La.App. 1st Cir.1984), writ denied, 468 So.2d 570 (La.1985).