ELIZABETH SEWELL, WIFE    *     NO. 2019-CA-0268
OF/AND WILLIAM SEWELL,
ELSEBETH FENNER, WIFE    *
OF/AND JAMES FENNER AND      COURT OF APPEAL
BETH DUESSING, WIFE    *
OF/AND GEORGE DUESSING      FOURTH CIRCUIT
         *
VERSUS       STATE OF LOUISIANA

        * * * * * * *

SEWERAGE AND WATER
BOARD OF NEW ORLEANS

CONSOLIDATED WITH:         CONSOLIDATED WITH:

SEWELL, ELIZABETH, ET AL         NO. 2020-CA-0624

VERSUS

SEWERAGE AND WATER
BOARD OF NEW ORLEANS


APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-04501, DIVISION "D"
Honorable Nakisha Ervin-Knott, Judge
* * * * * *
**Judge Tiffany G. Chase**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Tiffany G. Chase, Judge Dale
N. Atkins)


Joseph M. Bruno
Daniel A. Meyer
BRUNO & BRUNO LLP
855 Baronne Street
New Orleans, LA 70113

Michael T. Whitaker
THE WHITAKER LAW FIRM, APC
3 S/W Comer Mission and Ocean
Carmel, CA 93921

Alexis A. Butler
THE WHITAKER LAW FIRM, APC
201 St. Charles Avenue, Suite 2500
New Orleans, LA 70170

COUNSEL FOR PLAINTIFFS/APPELLEES

Craig B. Mitchell
Kiana M. Mitchell
Joseph B. Morton, III
Christopher D. Wilson
MITCHELL & ASSOCIATES, APLC
615 Baronne Street, Suite 300
New Orleans, LA 70113

Darryl Harrison
SEWERAGE & WATER BOARD OF NEW ORLEANS
625 St. Joseph Street
New Orleans, LA 70165

COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**
**JANUARY 20, 2021**

*TGC*
*DLD*
*DNA*

The Sewerage and Water Board of New Orleans (hereinafter "the S&WB") appeals the trial court's November 27, 2018 judgment awarding damages totaling $483,779.97 to plaintiffs: Julia Kingham and Rick Boehm; Beryl Mundee; Dr. Shaminder and Nomita Gupta; Jenelle Slobof and Neal Cohen; Jeannie and Bob Gaddy; Richard O'Neil; Anne Drown; Dr. Bryan and Meghan Payne; Jori Zlatkiss; and 2501 Napoleon Condominium Association (collectively "the Group B Plaintiffs").[1] The S&WB also appeals the trial court's March 28, 2019 judgment awarding $193,511.99 in attorneys' fees. After consideration of the record before this Court and the applicable law, we affirm the judgments of the trial court.

## FACTS AND PROCEDURAL HISTORY

This case involves several groups of homeowners who claimed their homes were damaged during the construction of a project in uptown New Orleans known as the Southeast Louisiana Urban Drainage Project (hereinafter "the SELA Project"). The SELA Project involved the construction of multiple drainage canals

---

[1] Mr. O'Neil, Ms. Drown, the Paynes and Ms. Zlatkiss all owned condominiums within 2501 Napoleon Avenue.

1

over several phases. The Group B Plaintiffs' properties are within the Napoleon II phase that spanned Napoleon Avenue between its intersections with Carondelet Street and South Claiborne Avenue.

In 2009, the United States Army Corps of Engineers (hereinafter "the CORPS") entered into a Project Partnership Agreement with the Louisiana Coastal Protection and Restoration Agency (hereinafter "the CPRA"), seeking to make the CPRA the non-federal sponsor for the project. Because the CPRA has no control over local drainage in Orleans Parish, it entered into a Cooperative Endeavor Agreement with the S&WB. Subsequently, in 2010, the S&WB signed a Programmatic Agreement (hereinafter "the PA") which identified areas where construction activity could potentially damage nearby structures. The two distinct areas mapped out in the PA were designated as the Construction Impact Zone[2] (hereinafter "the CIZ") and the Area of Potential Effect[3] (hereinafter "the APE"). A SELA Project brochure was available on the project's website and to those in attendance at the S&WB public informational meetings. The brochure explained that noise and vibrations from moving and operating heavy construction equipment could have an impact on structures located within close proximity to a Zone of

---

[2] The PA states that the CIZ "consists of construction right-of-way areas where the potential exists for damage to structures to occur as a result of soil vibration associated with sheet-pile driving and removal."

[3] "Area of potential effects means the geographic area or areas within which an undertaking may directly or indirectly cause alternations in the character or use of historic properties, if any such properties exist. The area of potential effect is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." 36 C.F.R. § 800.16(d). Specific to the SELA Project, the PA notes "the potential exists for indeterminable damage to properties within the [APE] as a consequence of construction activities."

Impact[4] (hereinafter "the ZOI"). Additionally, the S&WB hired a forensic contractor, Quick & Associates, to perform background pre-construction inspections of nearby properties and install vibration-monitoring equipment. The S&WB also maintained a hotline that logged complaints from nearby property owners.

In May 2015, numerous plaintiffs filed claims for damages to their property against the S&WB asserting theories of strict liability caused by timber pile driving, custodial liability, negligence and inverse condemnation. The S&WB filed an answer including third-party indemnity demands against the contractors hired by the CORPS. The case was removed to federal court in July 2015. After the federal trial court granted the contractors' motions for summary judgment based on immunity, the case was remanded to Civil District Court in January 2017. Given the large number of homeowners seeking recovery, the trial court divided the plaintiffs into trial groups. In March 2018, Residential Trial Group A claims were adjudicated after a four-day bench trial after which the trial court awarded plaintiffs $518,653.08 in damages.[5]

The Group B Plaintiffs' trial took place before the same trial judge from October 15 to 18, 2018. A significant issue at trial was the location and relative distance of the Group B Plaintiffs' properties from the SELA Project construction

---

[4] The brochure states: "The construction ZOI is defined as the area in which it is more likely than not that damages will occur. Based on scientific data obtained to date, the ZOI's outer boundary is at the line formed upon the surface at a forty-five (45) degree angle from the bottom tip depth of driven sheet pile."

[5] *See Sewell v. Sewerage & Water Bd. of New Orleans*, 2018-0996 (La.App. 4 Cir. 5/29/19), ___ So.3d ___, 2019 WL 2305673, *writ denied*, 2019-1166 (La. 10/15/19), 280 So.3d 612 (hereinafter "*Sewell I*").

site. Only two of the six properties, the Gupta property and the 2501 Napoleon Condominium, were within the APE. The trial court heard lay testimony from the Group B Plaintiffs and John Fogarty of the CORPS. The trial court heard both expert testimony and lay testimony.[6] On November 27, 2018, the trial court issued its written judgment, along with extensive written reasons, finding the S&WB liable for a total of $483,779.97 in damages pursuant to La. C.C. arts. 2317 and 2317.1, La. C.C. art. 667, and inverse condemnation. The trial court held a subsequent hearing to tax costs and fees associated with the litigation. By written judgment dated March 28, 2019, the trial court awarded $193,511.99 in attorneys' fees. The S&WB took separate appeals from these two judgments. This Court consolidated the appeals.

## STANDARD OF REVIEW

A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rossell v. ESCO*, 549 So.2d 840, 844 (La. 1989). "[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id*. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id*. Thus, "the issue to be resolved by a reviewing court is not

---

[6] Specifically, the following expert testimony was presented: Dr. Rune Storesund (hereinafter "Dr. Storesund"), Michael Gurtler, Fritz Gurtler (collectively "the Gurtlers"), Dr. Wade Ragas (hereinafter "Dr. Ragas"), Dr. David Sykora (hereinafter Dr. Sykora") and Dr. James Bob Bailey (hereinafter "Dr. Bailey"). The trial court also received the depositions of Brad Ridenhauer and Mubashir Maqbool and thousands of pages of exhibits.

4

whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Stobart v. State through Dep't of Transp. and Dev.*, 617 So.2d 880, 882 (La. 1993).

## **DISCUSSION**

Litigation surrounding the SELA Project has recently been before this Court on numerous occasions. *See Sewell I*; *Greenblatt v. Sewerage & Water Bd. of New Orleans*, 2019-0694 (La.App. 4 Cir. 12/20/19), 287 So.3d 763; *Lowenburg v. Sewerage & Water Bd. of New Orleans*, 2019-0524 (La.App. 4 Cir. 7/29/20), ___ So.3d ___, 2020 WL 4364345. In *Greenblatt*, plaintiff therein had his claim adjudicated in the same trial as the Group B Plaintiffs – the trial court rendered one judgment, with accompanying written reasons. *Id.*, 2019-0694, p. 8, 287 So.3d at 769. Thus, this Court has previously considered several of the S&WB's asserted assignments of error; specifically, that the S&WB is the custodian of the SELA Project, that inverse condemnation damages include the full extent of just compensation, and that the trial court did not err in failing to assign comparative fault. *See Id.*, 2019-0694, pp. 4-6, 287 So.3d at 767-68; *Sewell I*, 2018-0996, pp. 4-19, 2019 WL 2305673 at *2-9. These issues are not plaintiff-specific and we will not revisit them in the matter *sub judice*. *See Bank One Nat. Ass'n v. Velten*, 2004-2001, pp. 5-7 (La.App. 4 Cir. 8/17/05), 917 So.2d 454, 458-59 (discussing application of the law of the case doctrine and its underlying policy reasons). However, the S&WB emphasizes a key factual distinction in this case; namely,

5

whether the distance of the Group B Plaintiffs' properties from the SELA Project construction site differs from the *Greenblatt* and *Sewell I* plaintiffs.

Thus, we frame the S&WB's remaining assignments of error as follows: 1) the trial court erred in its finding of custodial liability; 2) the trial court erred in its finding of strict liability for ultra-hazardous timber pile driving; 3) the trial court erred in its finding of inverse condemnation or, alternatively, the quantum of damages; and 4) the trial court erred in its award of attorneys' fees. We address these arguments in turn.

### CUSTODIAL LIABILITY

The S&WB avers the trial court erred in its finding of custodial liability. A finding of custodial liability against a public entity requires that a plaintiff prove four elements: 1) the thing which caused damage was owned or in the custody of the public entity; 2) the thing was defective due to a condition creating an unreasonable risk of harm; 3) the public entity had actual or constructive notice of the defective condition yet failed to take corrective action within a reasonable period of time; and 4) the defect was the cause of the plaintiff's harm.[7] As to the first element, this Court has previously determined that the S&WB exercised custody over the SELA Project. *Sewell I*, 2018-0996, p. 11, 2019 WL 2305673 at *6 (citing La. C.C. arts. 2317 and 2317.1; La. R.S. 9:2800). We examine the remaining elements in relation to the facts specific to the Group B Plaintiffs.

---

[7] The S&WB's argument that the trial court conducted an "abrogated" analysis of this claim is without merit. As this Court observed in *Sewell I*, "a trial court's 'oral and written reasons for judgment form no part of the judgment and that appellate courts review judgments, not reasons for judgment.'" 2018-0996, pp. 10-11, 2019 WL 2305673 at *5 (quoting *Wooley v. Lucksinger*, 2009-0571, p. 77 (La. 4/1/11), 61 So.3d 507, 572).

## *Condition Creating an Unreasonable Risk of Harm*

The second element required for a finding of custodial liability against a public entity examines whether a thing is defective such that it creates an unreasonable risk of harm. The S&WB argues that all of the Group B Plaintiffs' properties were outside of the ZOI and CIZ and that all but two – the Gupta property and the 2501 Napoleon Condominium – were outside of the APE. Further, that the various agreements the S&WB perfected with the CORPS only anticipated damages within the ZOI and CIZ thus the construction activity did not create an unreasonable risk of harm to the Group B Plaintiffs. "Whether a risk is unreasonable is a matter 'wed to the facts' and must be determined in light of the facts and surrounding circumstances of each particular case. There is no fixed rule as to whether the thing presents an unreasonable risk of harm."[8] *Dupree v. City of New Orleans*, 1999-3651, pp. 13-14 (La. 8/31/00), 765 So.2d 1002, 1012 (internal quotation omitted).

The trial court found that the "S&WB was well aware that the project presented a risk of harm to plaintiffs' properties pursuant to the terms of the PA and its understanding from [the] CORPS that properties could experience vibration related damages." The trial court also found that the "S&WB provided a hotline for anticipated complaints from homeowners" and that the "S&WB hired a forensic contractor [Quick & Associates] who was required to collect photo

---

[8] Factors for a trial court's consideration include: "(1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved." *Dupree*, p. 14, 765 So.2d at 1012.

7

documentation of all existing structures prior to initiation of construction for purposes of claim resolution." Plaintiff, Beryl Mundee (hereinafter "Ms. Mundee") testified that workers from Quick & Associates came to her property on South Liberty Street, outside of the APE, in September 2012 and took approximately two hundred photographs.[9] Ms. Mundee also testified her home was in perfect condition in 2012 and that her first complaint of damages to the S&WB hotline was not until September 2015. During his direct examination, Dr. Bailey relied on 2011 photographs taken by Quick & Associates as a pre-construction activity reference when discussing damages present in the *Greenblatt* properties located within the APE. This evidence suggests that the S&WB anticipated damages as far reaching as Ms. Mundee's property outside of the APE. Accordingly, we find the trial court had a reasonable basis to support its finding that the construction activity related to the SELA Project created an unreasonable risk of harm of which the S&WB was aware.

### *Actual or Constructive Notice*

The third element required for a finding of custodial liability against a public entity examines whether the public entity had actual or constructive notice of the defect and failed to take corrective action. "Actual notice is given under La. R.S. 9:2800 by reporting the defect to a governmental employee who has a duty 'either to keep the property involved in good repair or to report dangerous conditions to the proper authorities.'" *Sewell I*, 2018-0996, p. 11, 2019 WL 2305673 at *5

---

[9] Ms. Mundee later requested these photographs in 2016 but the photos were never produced.

(citation omitted) (internal quotation omitted). The trial court found that the S&WB had notice that the construction activity was causing damage as demonstrated by the complaints it received. The record reflects numerous Group B Plaintiffs testified to calling the hotline to report damages including Ms. Mundee, Ms. Kingham (via her domestic partner, Rick Boehm), Ms. Gaddy and Ms. Slobof – all of whose properties were located outside of the APE. Documentary reports summarizing the complaints corroborated this testimony. Mr. O'Neil complained to his then-councilwoman, Latoya Cantrell. The Group B Plaintiffs further testified that although, on occasion, the S&WB dispatched investigators, nothing was done short of receiving letters stating their damage was not due to the SELA Project. Given the geographic spread of these reports, we find the trial court did not err in determining that the S&WB had actual or constructive notice of the damages the SELA Project was causing.

### *Causation*

The fourth element required for a finding of custodial liability against a public entity is causation. The S&WB argues the Group B Plaintiffs' failed to produce sufficient evidence to show construction activity related to the SELA Project was the cause of their damages. A plaintiff must prove causation by a preponderance of the evidence. *Sewell I*, 2018-0996, p. 13, 2019 WL 2305673 at *6. "To be actionable, the cause need not be the sole cause but, it must be a cause in fact, and to be a cause in fact it must have a proximate relation to the harm which occurs and it must be substantial in nature." *Id.* (citing *Chanthasalo v.*

9

*Deshotel*, 2017-0521, p. 9 (La.App. 4 Cir. 12/27/17), 234 So.3d 1103, 1109). "If…circumstantial evidence is relied upon, that evidence, taken as a whole, must exclude every other reasonable hypothesis with a fair amount of certainty." *Sewell I*, 2018-0996, p. 13, 2019 WL 2305673 at *6. In its finding of causation, the trial court relied on both lay witness and expert testimony observing "the evidence shows a consistency and commonality of damages shared by all houses along the SELA Project route."

All of the Group B Plaintiffs' testified to having, at most, only minor issues with their properties prior to the start of the SELA Project. In many instances, appraisal reports predating the construction activity corroborated their testimony. The Group B Plaintiffs testified to experiencing vibrations of such intensity that their houses shook from either the timber pile driving or the constant operation of other heavy equipment and construction traffic. The Group B Plaintiffs further testified that as the construction progressed, damage manifested itself in a variety of common forms including significant cracking of walls, separation of molding, separation of baseboards, separation of porches and steps, and unaligned door and window frames.

The expert witnesses presented competing theories of causation. Dr. Storesund offered a general causation opinion that the construction activity from the SELA Project was a substantial factor in causing damage to the Group B Plaintiffs' properties. He testified there were vibrational spikes in excess of the

requisite threshold, 0.25 ppv,[10] in the area around the Group B Plaintiffs' properties. Although he could not place them specifically in front of the properties at issue, he opined that the reliability of the vibration monitoring data was incomplete and unreliable given inconsistent placements – for example, no vibration monitoring equipment was in place on the side streets off Napoleon Avenue. He further questioned the methodology behind setting the scope of the ZOI and observed that, by definition; the APE "is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." 36 C.F.R. § 800.16(d).

Michael Gurtler testified that the damage to the Group B Plaintiffs' properties is consistent with the damage he has seen elsewhere within approximately one block of the SELA Project. He further testified the damage is unique to this area and is not similar to the type of settlement damage seen in other properties across the New Orleans area. Michael Gurtler explained that most settlement-related damage occurs within the first year to two years of initial construction and effectively stops within five years. He opined that the only plausible explanation for the damages is due to the SELA Project causing vibrations from either timber pile driving, or heavy equipment and construction vehicles moving on residential streets not designed to support them. Fritz Gurtler concurred and testified the damage seen to properties within the ZOI is consistent with the damage to nearby properties, despite their location on adjoining side

---

[10] Peak particle velocity (ppv) is a measure of vibration.

streets and outside of the APE. He further opined that even if some initial damage was due to differential settlement, the construction activity related to the SELA Project exacerbated any pre-existing damage. He confirmed that vibrations generated by the construction activity was a substantial contributing cause of the damage to the Group B Plaintiffs' properties.

Conversely, the S&WB's expert, Dr. Sykora disagreed with Michael Gurtler's opinion that settlement damage stops after five years. He opined that, according to his first hand inspections, the damage to the Group B Plaintiffs' properties was from the progressive, long-term differential settlement over the life of the buildings primarily because of the expansive and compressible soil. Dr. Syorka testified that the vibrational threshold used for the SELA Project was on the conservative end and, typically, building damages do not result unless vibration readings exceed 0.5 ppv. He further testified that vibrations from the construction activity would attenuate and result in a lesser impact, particularly for distances greater than fifty feet from the source of the vibrations. Dr. Sykora discounted the lay witness testimony to the extent he testified people are more sensitive to vibrations than buildings.

Dr. Bailey agreed with Dr. Sykora that the construction activity did not cause any structural damage to the Group B Plaintiffs' properties and that any cosmetic damage (e.g., sheetrock and floorboards) was due to differential settlement or other forms of distress such as seasonal temperature changes. Dr. Bailey also refuted several aspects of the Gurtler Brothers' assessments as to the

amount of repairs and painting necessary to restore the Group B Plaintiffs' properties assuming the construction activity did cause damages.

A trial court has broad discretion in determining the weight given to expert testimony including the discretion to substitute common sense and judgment when warranted by the record. *See 429 Bourbon Street, LLC v. RMDR Investments, Inc.*, 2016-0800, p. 15 (La.App. 4 Cir. 11/15/17), 230 So.3d 256, 266 (citations omitted). Where findings of fact are based on determinations regarding the credibility of expert witnesses, the manifest error standard requires appellate courts to give great deference to a trial court's findings. *See Bellard v. American Cent. Ins. Co.*, 2007-1335, p. 27 (La. 4/18/08), 980 So.2d 654, 672 (citing *Rosell*, 549 So.2d at 844). Thus, where a trial court bases a factual determination on a decision to credit one set of experts over another, such a finding can virtually never be manifestly erroneous. *Id.* (citing *Rosell*, 549 So.2d at 845).

The trial court, in assessing the credibility of the experts, chose to accept the testimony of Dr. Storesund and the Gurtlers. In conjunction with evaluating the testimony from the lay witnesses,[11] the trial court made a factual determination that the construction activity related to the SELA Project was the cause of the damages and rejected the hypothesis that differential settlement was the cause of the damages. *See Rando*, 2008-1163, p. 33, 16 So.3d at 1090; *Holzenthal v. Sewerage & Water Bd. of New Orleans*, 2006-0796, p. 37 (La.App. 4 Cir. 1/10/07), 950

---

[11] The trial court found the lay witnesses credible opining that they all "had first-hand knowledge of the condition of their homes before and after construction." *See* La. C.E. art. 701 (lay witnesses may testify in the form of an opinion or inferences if rationally based on their perception and helpful to the determination of a fact in issue).

So.2d 55, 78 (observing crack-by-crack analysis is unnecessary in weighing expert testimony). After reviewing the record, we find the trial court did not err in finding "the commonality of the damages indicates that [the Group B Plaintiffs'] properties were adversely affected by the [SELA Project] construction activity." Accordingly, the S&WB assignment of error as to the trial court's finding of custodial liability is without merit.

### STRICT LIABILITY FOR ULTRA-HAZARDOUS TIMBER PILE DRIVING

The S&WB avers the trial court erred in its finding of strict liability for ultra-hazardous timber pile driving. Although it stipulated that timber pile driving occurred during the Napoleon II phase, the S&WB argues the Group B Plaintiffs failed to meet their burden of proof that their damages resulted from this activity. "In a strict liability action for timber pile driving, proof of the causative factor is subject to the same standard as proof of negligence in a delictual action."[12] *Sewell I*, 2018-0996, p. 13, 2019 WL 2305673 at *6. The trial court's judgment decrees that the "S&WB is strictly liable under Louisiana Civil Code article 667 for ultra-hazardous pile driving which occurred near the properties in the Napoleon II phase of the SELA project." The S&WB specifically argues that the damages incurred by Ms. Slobof and Ms. Drown could not be attributed to timber pile driving because they did not purchase their properties until 2014 – after timber pile driving had ceased on the Napoleon II phase. Nevertheless, as the Group B Plaintiffs point

---

[12] As discussed previously in this opinion, this Court has already determined that the S&WB had custody over the SELA Project and its accompanying timber pile driving activity. *See Greenblatt*, 2019-0694, p. 5, 287 So.3d at 767-68 (quoting *Sewell I*, 2018-0996, pp. 12-13, 2019 WL 2305673 at *6).

out, the trial court's reasons do not delineate an award of damages to Ms. Slobof

and Ms. Drown specifically based on timber pile driving. While Dr. Storesund and

the Gurtlers acknowledged that timber pile driving could not be the cause of the

damage for these two properties, they all opined that the damage relates to other

construction activity such as the movement of loaded trucks and heavy equipment.

As to the remaining Group B Plaintiffs, the S&WB interprets our decisions

in *Holzenthal* and *Sewell I* to require that the "totality of the evidence" related to

causation for timber pile driving must derive from a certain location, distance and a

specific data set of vibration readings. We disagree. The only requirement is that

a plaintiff prove damage and causation by a preponderance of the evidence. *See*

*Sewell I*, 2018-0996, p. 13, 2019 WL 2305673 at *6. In light of the evidence

previously reviewed for the claims under custodial liability, we find this

assignment of error is without merit.[13]

### INVERSE CONDEMNATION

The S&WB avers the trial court erred in its finding of inverse condemnation

and in the quantum of damages awarded. "Property shall not be taken or damaged

by the state or its political subdivisions except for public purposes and with just

compensation paid to the owner or into court for his benefit." La. Const. Art. I §

4(B)(1). An inverse condemnation claim provides a procedural remedy to a

---

[13] In our discussion of custodial liability, we affirmed the trial court's finding that the S&WB anticipated the SELA Project's construction activity would result in damage to the Group B Plaintiffs' properties. Thus, the S&WB would be liable under La. C.C. art. 667 even in the absence of ultra-hazardous activity. *See Holzenthal*, 2006-0796, p. 21, 950 So.2d at 70; La. C.C. art. 667 (proprietor is answerable to damages on a showing he knew or should have known that his works would cause damage in the absence of exercise of reasonable care).

property owner seeking compensation when they are subject to such a taking.  *See Faulk v. Union Pacific Railroad Co.*, 2014-1598, p. 9 (La. 6/30/15), 172 So.3d 1034, 1043-44.  "In the constitutional sense, a taking is 'any substantial interference with the free use and enjoyment of property.'"  *Lowenburg*, 2019-0524, p. 13, 2020 WL 4364345 at *7 (quoting *Simmons v. Bd. of Comm'rs of Bossier Levee Dist.*, 624 So.2d 935, 949 (La.App. 2 Cir. 1993)).  In reviewing a finding of inverse condemnation, appellate courts must ensure the record adequately supports the trial court's finding that a plaintiff's claim meets a three-prong test: 1) whether a recognized species of property right has been affected; 2) whether the property has been taken or damaged in a constitutional sense; and 3) whether the taking or damaging has been for a public purpose under La. Const. Art. I § 4.  *See  Holzenthal*, 2006-0796, p. 14, 950 So.2d at 66; *Avenal v. State*, 2003-3521, pp. 26-27 (La. 10/19/04), 886 So.2d 1085, 1104 (citing *State Through Dep't of Transp. and Dev. v. Chambers Inv. Co., Inc.*, 595 So.2d 598, 602 (La. 1992)).  As discussed previously in this opinion, this Court affirmed the trial court's judgment as to the first and third prongs.  *See Greenblatt*, 2019-0694, p. 4, 287 So.3d at 767; *see also Sewell I*, 2018-0996, pp. 4-19, 2019 WL 2305673 at *4-9 (finding that "the SELA Project was a state project, wherein the S&WB was acting under its power of eminent domain" and that "the trial court did not err in awarding damages for loss of use and enjoyment of [plaintiffs'] properties when awarding just compensation").  We therefore turn our analysis to the second prong of the *Chambers* test.

16

In order to satisfy the second prong of the *Chambers* test, the Group B Plaintiffs were required to prove that "they suffered loss of use and enjoyment of their properties by experiencing noise, vibrations, dust, loss of access, and loss of parking as well as property damage." *Lowenburg*, 2019-0524, p. 13, 2020 WL 4364345 at *7. Given the infinite variety of ways in which government actions can affect property interests, most inverse condemnation claims turn on situation-specific factual inquiries. *Faulk*, 2014-1598, p. 30, 172 So.3d at 1057. The S&WB argues there is insufficient evidence to constitute a taking citing to *Chambers* wherein our Supreme Court held plaintiff's alleged interference did not amount to a greater interference than what he was bound to tolerate under La. C.C. art. 668. 595 So.2d at 605-06. We disagree. *Chambers* is factually distinguishable because our Supreme Court explicitly noted that plaintiff therein "failed to testify with any specificity as to the nature of the construction activity, exactly how it interfered or would interfere with the development of [his property], or the degree to which the State's construction activities on its land would occasion inconvenience to [plaintiff's] investment." *Id*. The record before us does not lack such detailed testimony. All of the Group B Plaintiffs testified as to their experiences living through the SELA Project construction.

The Group B Plaintiffs presented testimony as to several factors that affected the use and enjoyment of their properties. First, the Group B Plaintiffs testified that the excessive noise and vibrations made it difficult for them to work from home, sleep and go about daily activities. Second, the Group B Plaintiffs testified

to the heavy amounts of dust that would cover the exterior areas of their properties and infiltrate the interior of their homes. Third, the Group B Plaintiffs testified to construction vehicles and equipment blocking access to their driveways and blocking street access. Finally, the Group B Plaintiffs testified that a combination of the above factors prevented them from entertaining family members and guests.

Dr. Storesund testified that the S&WB did not calibrate the vibration monitoring equipment to monitor sound exposure levels despite the ability of the equipment having such capability – it only recorded spikes starting in the 90 dB to 100 dB range. He further testified that this exceeded the 85 dB limit allowed by the Napoleon II project specifications. Dr. Storesund relied on these reported spikes and the aggregate decibel level of equipment used on a given day to corroborate the Group B Plaintiffs' noise exposure testimony. Unlike the plaintiff in *Chambers*, the above testimony reflects actual, not speculative or trivial, loss of use and enjoyment. *See SDS, Inc. v. State, Dep't of Transp. and Dev.*, 2007-0406, p. 6 (La.App. 4 Cir. 2/13/08), 978 So.2d 1013, 1017. Accordingly, we find the trial court did not err in its finding of inverse condemnation.

The S&WB further avers the trial court erred in the quantum of the inverse condemnation damage awards. "The determination of what amount will compensate the owner of a property right to the full extent of his loss because of expropriation of his right must be made on the basis of the facts of each case and in accord with the uniqueness of the thing taken." *Louisiana Intrastate Gas Corp. v. Gulf Outlet Lands, Inc.*, 542 So.2d 705, 706 (La.App. 4th Cir. 1989) (further

observing that "the weight given to expert testimony is within the province of the trial judge"); *see also Sewell I*, 2018-0996, p. 16, 2019 WL 2305673 at *8 (trial court has great discretion in its awarding of damages).  In awarding inverse condemnation damages, the trial court relied on valuations provided by Dr. Ragas.  Factors used by Dr. Ragas included the damage Group B Plaintiffs sustained to their property, dust in their homes, vibrations, noise and the loss of access to parking.  Although the S&WB took issue with certain aspects of Dr. Ragas' valuations, it did not present an expert witness of its own to controvert those valuations.  The record reflects the trial court, after reviewing the testimonial and documentary evidence, awarded significantly less for loss of use and enjoyment than what the Group B Plaintiffs requested.  We therefore find the S&WB's assignment of error as to the trial court's finding of inverse condemnation and accompanying damage award is without merit.

## ATTORNEYS' FEES

The S&WB avers the trial court erred in its award of attorneys' fees. Specifically, it requests this Court reduce the quantum of attorneys' fees awarded in the event this Court reduces the damages awarded to the Group B Plaintiffs. Appellate courts review a trial court's award of attorneys' fees under an abuse of discretion standard.  *Greenblatt*, 2019-0694, p. 12, 287 So.3d at 771 (citing *Covington v. McNeese State Univ.*, 2012-2182, p. 6 (La. 5/7/13), 118 So.3d 343, 348).

The record reflects that while the Group B Plaintiffs requested attorneys' fees greater than the forty percent contingency fee arrangement, counsel for the S&WB argued, "the contingency fee agreement should be the most appropriate remedy." The trial court, rejecting the Group B Plaintiffs' request for an increase, awarded attorneys' fees of $193,511.99 calculated pursuant to the forty percent contingency fee arrangement.

An appellate court's role is not to determine what it considers to be an appropriate award of attorneys' fees, but rather to review the exercise of discretion of the trial court. *Covington*, 2012-2182, p. 11, 118 So.3d at 351. The trial court observed the time and effort expended by counsel, the intricacies of the facts involved, and received documentary evidence of the contingency fee arrangement and billing statements. *See State, Dep't of Transp. & Dev. v. Williamson*, 597 So.2d 439, 442 (La. 1992). Given that the trial court's award of attorneys' fees based on the forty percent contingency fee arrangement is reasonable – and that we have not altered the quantum of the trial court's award of damages – we find the trial court did not abuse its discretion in setting attorneys' fees. This assignment of error is without merit.

## DECREE

For the foregoing reasons, we affirm the judgment of the trial court.

**AFFIRMED**